JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 03 C 3120 | DATE | 6/24/2004 |
| CASE TITLE | Green et al vs. Butler et al | | |

MOTION: [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Ruling held. **ENTER MEMORANDUM OPINION:** Defendants' motion (Doc 24-1) for summary judgment is granted. Judgment entered.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | Document Number |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | JUN 2 5 2004 | 29 |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| SCT | courtroom deputy's initials | 2004 JUN 24 PM 4:51 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL J. GREEN and CHERYL POULSEN, )
)
                Plaintiffs, )
)
vs. ) 03 C 3120
)
MARLO BUTLER, DAVID CARROLL, MARK )
SALSBERRY, AMY FREUND, and JEFFREY )
BRYANT, each in his or her individual capacity, )
)
                Defendants. )

DOCKETE
JUN 2 5 2004

## MEMORANDUM OPINION

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court on Defendants' motion for summary judgment. For the reasons set forth below, the motion is granted.

## BACKGROUND

Plaintiff Michael Green owns a house in Warrenville, Illinois. On February 23, 2003, the date of the events that form the basis of the complaint, Green lived in the house with his girlfriend, Plaintiff Cheryl Poulsen. A long-time acquaintance of Green's, Michael Belter, also lived in the Warrenville house. Belter paid Green $300 a month in rent pursuant to an oral lease.

Prior to coming to live with Green and Poulsen, Belter had been convicted of a criminal sexual offense against a minor. As of February 2003, he was on parole for this offense, and his movements were electronically monitored. When Belter moved into the Warrenville house, Green and Poulsen were aware that Belter was on parole, although Belter had not apprised them of the full extent of restrictions to which he was subject. Neither inquired about specific limitations Belter had pursuant to his parole status.

When Belter moved into the Warrenville house, he executed a "Host Site Agreement." The agreement did not indicate that anyone other than Belter lived at the Warrenville house, and it provided that the "residence is subject to search at any time by parole agents or designated Illinois Department of Corrections' staff and I explicitly consent thereto." The agreement also provides that a parole agent or designated Illinois Department of Corrections ("IDOC") staff may enter the residence at any time to conduct meetings with the parolee to verify compliance with parole or supervised release conditions. Belter alone signed this document, even though he informed his then parole officer, Richard Guise, that he was not the homeowner. It is disputed by the parties whether Guise ever became aware that Green was the homeowner and that he lived at the Warrenville house as well.

In December 2002, Belter came under the supervision of a different parole officer, Defendant Marlo Butler. She reviewed the IDOC computer files for Belter, which stated that Belter lived alone. On February 23, 2003, Butler went to the Warrenville house for a random monthly visit. She was accompanied by Defendant Jeffrey Bryant. The parties dispute whether Bryant was aware that Belter was not the only resident of the house at that time.

When Butler and Bryant arrived at the Warrenville house, Belter came out of the front door and shut it behind him. He refused to let the two agents enter the house, telling them that the owner was not home. The agents left without entering the house but concluded that they needed to return with other agents to assist them. Butler called Defendant Mark Salsberry to join them. Salsberry, accompanied by Defendants Amy Freund and David Carroll, met with Butler and Bryant at a nearby restaurant to discuss the visit before they went back to the house. Freund and Salsberry checked their computer files for information on Belter; they still stated that Belter lived alone.

By the time the agents went back to the Warrenville house, Green and Poulsen had returned. Green was in the garage; Poulsen and Belter were in the main part of the house. Bryant stayed outside; the other four agents entered the house. The parties dispute the precise details of how the entry took place, particularly whether the first agent to enter knocked on the door and stated who they were and why they were there.

Once the agents were inside, they identified Belter. Salsberry and Freund spoke with him in his bedroom on the second floor; they also handcuffed him and escorted him out to one of the squad cars. Meanwhile, the other agents spoke with the occupants of the house, sometimes rather heatedly. Eventually, Green was persuaded to sign a host site agreement with respect to Belter. At that point, the agents released Belter and left.

As a result of the events of that day, Green and Poulsen filed suit against the agents under 42 U.S.C. § 1983, alleging that the agents violated their constitutional rights by entering the house as well as conspiring to do so. The parties have completed discovery, and the agents now move for summary judgment in their favor on both counts of the complaint.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears

the burden of proof at trial. Id. The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. Id. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). With these principles in mind, we turn the motion before us.

## DISCUSSION

### 1. Reasonableness of the Search

Under the protections of the Fourth Amendment, most warrantless searches are presumptively unreasonable. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043 (1973). There are several important exceptions. Two that are significant to this case are the so-called "special needs" exception and situations in which authorities obtain consent from a person with actual or apparent authority over the area to be searched. See Griffin v. Wisconsin, 483 U.S. 868, 873 107 S. Ct. 3164, 3169 (1987) (special needs presented by probation setting); New Jersey v. T.L.O., 469

U.S. 325, 332 n.2, 105 S. Ct. 733, 737 n.2 (1985) (special needs presented by public school setting); United States v. Matlock, 415 U.S. 164, 170–71, 94 S. Ct. 988, 993 (1974) (consent); Zap v. United States, 328 U.S. 624, 628, 66 S. Ct. 1277, 1279 (1946) (same).

To determine whether a warrantless search was reasonable under the Fourth Amendment, a court must compare the degree to which the individual's privacy is invaded with the degree to which the search is needed to promote legitimate government interests. United States v. Knights, 534 U.S. 112, 118–19, 122 S. Ct. 587, 591 (2001). The degree to which the privacy is invaded goes hand in hand with the extent to which the party challenging the governmental action legitimately expects the privacy to exist. See Illinois v. McArthur, 531 U.S. 326, 331, 121 S. Ct. 946, 950 (2001).

In this case, it is undisputed that both Green and Poulsen knew that Belter lived in the house and that he was on parole. Parolees, as an incident of their status, have a reduced expectation of privacy. While that does not mean that Green and Poulsen's privacy interests were as curtailed as Belter's for all purposes, Green and Poulsen could not reasonably expect, under these circumstances, that their privacy would remain the same as it would have been if they were the only occupants of the house. Even when a cotenant is not a parolee, there is a reduced expectation of privacy simply by the

presence of the other person. United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997). When the roommate is a parolee, and thereby subject to a lesser enjoyment of privacy, the reasonable expectation of privacy of a cohabitant is correspondingly diminished by the broader range of government activities permissible against the parolee who shares the living space. See U.S. v. Jones, 152 F.3d 680, 686 (7th Cir. 1998); Wisconsin v. West, 517 N.W.2d 482, 488 (Wis. 1994).

It is also important to note that a legitimate expectation of privacy is "one which society, and not the individual, is prepared to recognize as reasonable." People v. Blake, 417 N.E.2d 682, 685 (Ill. App. Ct. 1981). Society is not prepared to recognize that a parolee living with someone who is not under restriction need not comply with the terms of his or her parole simply by virtue of the presence of the nonparolee. Thus, at least for purposes of common living areas and those under Belter's control, the legitimate expectation of Green and Poulsen was coterminous with that of Belter.

Next, we turn to the level of intrusion inflicted by the entry and search. In this case, the intrusiveness was minimal as to Green and Poulsen. It is undisputed that the agents confined their entry to common areas of the house and Belter's bedroom. They did not enter any other bedrooms, closets, or other space to which Belter did not have full access. There is no indication that the agents' entry was prompted by anything but Belter's actions; Green and Poulsen have not adduced any evidence that the agents

were actually trying to effect a search for evidence against them and using Belter to circumvent the need for a warrant. The agents did not take advantage of their presence in the residence and departed shortly after determining that Belter was telling the truth that he was not the owner of the house and did not live alone. The combination of lowered expectation of privacy with the minimal extent of the search makes the total intrusion on Green and Poulsen's privacy relatively small.

Turning to the degree to which the search is necessary to serve the government's legitimate interests, we note that Belter's status as a parolee is a significant factor in our analysis. The operation of a parole system by the state of Illinois presents "special needs beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." Griffin, 483 U.S. at 872–73, 107 S. Ct. at 3168. The nature of the parole arrangement is to expose a known offender to the public before a sentence has been fully served. This scenario implicates the public safety in a profound way, given the available evidence that recidivism is more likely to occur than first-time offenses and the inherent incentive of parolees to take active steps to conceal continuing criminal activity because of the consequences of discovery and the quick return to prison. See Knights, 534 U.S. at 120, 122 S. Ct. at 592. All of these factors add up to a substantial need for searches such as the one in this case where a parolee exhibits suspicious and obstructive behavior, particularly where

consent has previously been given for the very activities the agents are trying to conduct.

Green and Poulsen contend that Belter's consent is not relevant because his refusal to allow Butler and Bryant to enter the house operated as a revocation of any consent given. First, we do not agree that Belter was able to revoke his consent. Under Illinois law, every person who is subject to parole or mandatory supervised release must, as a condition thereof, "consent to a search of his or her person, property, or residence under his or her control." 730 ILCS 5/3-3-7(10). Belter had been informed of this condition upon his release in 2001.

In any event, under the circumstances of this case, whether Belter revoked his consent is not relevant. Belter, a convicted sex offender whose victim was a minor, had already been relocated because he was living too close to a school or day care center. He also had lived alone at that residence. When Butler and Bryant first encountered him, Belter came outside of the house and immediately closed the door so as to prevent the agents from being able to see anything behind him. There is no question that he did not know who the agents were when they came to the house. The easily available inference that Belter was engaging in criminal activity is enough to reduce the standard necessary to effect a search from probable cause to reasonable

suspicion, as well as obviating a warrant. <u>Knights</u>, 534 U.S. at 121, 122 S. Ct. at 592-93.

Green and Poulsen also contend that Salsberry's failure to knock on the front door before the agents entered and identify himself controls our decision and mandates denial of summary judgment. It is disputed whether Salsberry in fact failed to properly implement the "knock-and-announce" rule, but even assuming that he did, that does not make the entry and search *per se* unreasonable. It is a factor to be considered in the overall analysis of reasonableness, but it does not outweigh all other factors. <u>See</u> <u>U.S. v. Sutton</u>, 336 F.3d 550, 552 (7th Cir. 2003).

Putting all of these components together, we conclude that the totality of the circumstances in this case unequivocally indicate that the entry and search of the Warrenville house was reasonable. Consequently, it did not violate Green and Poulsen's Fourth Amendment rights, and no cause of action lies under 42 U.S.C. § 1983 either directly or via the theory of conspiracy alleged in Count II of the complaint.

## 2. Qualified Immunity

As we have concluded that the search did not violate the Fourth Amendment, there is no need to consider the agents' defense of qualified immunity. However, as should be apparent from the discussion above, the unusual factual circumstances of this case make the contours of Green and Poulsen's rights in this situation fuzzy enough

that it would not be clear to a reasonable agent in the same setting that the course of conduct the agents undertook was unlawful. See Saucier v. Katz, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001). A reasonable officer with the information that the agents possessed at the time they entered the house, namely information indicating that Belter lived alone, that he had consented to entry and search, and that he had been exhibiting behavior arguably in violation of the terms of his release, could have concluded that the search was permitted by the Fourth Amendment. See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S. Ct. 2806, 2817 (1985). Thus, the agents would be entitled to qualified immunity here. See Shea v. Smith, 966 F.2d 127, 130-32 (3d Cir. 1992).

## CONCLUSION

Based on the foregoing analysis, the motion for summary judgment is granted.


_____
Charles P. Kocoras
Chief Judge
United States District Court

Dated: JUN 2 4 2004